1
2
3
4
5
6                       UNITED STATES DISTRICT COURT

7                     NORTHERN DISTRICT OF CALIFORNIA

8
DENIZ BOLBOL,                                No. C 09-01944 MHP
9
                Plaintiff,
10
                                             **MEMORANDUM & ORDER**
      v.
11                                           **Re: Defendants' Motion for Summary
CITY OF DALY CITY, et.al.,                   Judgment; Plaintiff's Motion to Consolidate
12                                           Related Case and For Leave to File First
                Defendants.                  Amended Complaint**
13 _____/

14
15          Plaintiff filed suit against various defendants alleging violations of civil rights under

16    both federal and state law.  Defendants are the City of Daly City ("City"), Daly City Police Chief

17    McLane ("McLane") and Daly City Police Officer Kranz ("Kranz").  Before the court is defendants'

18    motion for summary judgment, or in the alternative, for partial summary judgment.  Plaintiff

19    opposes the motion and has brought a motion to consolidate related action and for leave to file a first

20    amended complaint.  Defendants oppose both of plaintiff's motions.  Having considered the parties'

21    submissions and arguments, the court enters the following memoranda.

22    BACKGROUND
23
            As is necessary in a motion for summary judgment, the facts are set forth in the light most
24
      favorable to the non-moving party, here, the plaintiff.  Accordingly, unless otherwise noted, the
25
      following facts are taken from Deniz Bolbol's Declaration. Docket No. 42 (Bolbol Dec.).[1]
26
27
28

**United States District Court**
For the Northern District of California

1    Plaintiff, Deniz Bolbol ("Bolbol"), is a member of Citizens for Cruelty-Free Entertainment

2  ("CCFE"), a San Francisco Bay Area group dedicated to the humane treatment of animals and

3  educating the public about the abuse and mistreatment of animals.  As a member of this group,

4  Bolbol holds signs and banners offering information to the general public about the treatment of

5  animals used by circuses.  Bolbol also videotapes the treatment of circus animals as a means of

6  educating the public about the abuse and mistreatment of animals by the circus.

7    The Cow Palace is a performance facility owned by the State of California and operated by

8  No. 1-A District Agricultural Association ("the Association").  Docket No. 69 (Joint Statement of

9  Undisputed Facts ("JSUF")) at 1.  In September 2008, the Carson and Barnes Circus ("the Circus")

10  rented out the Upper Parking Lot of the Cow Palace pursuant to a License Agreement ("License

11  Agr."), Docket No. 35-3 (Drake Dec.), Exh. B (License Agr.), and First Amendment Policy

12  ("Policy"), Docket No. 35-3 (Drake Dec.), Exh. C (Policy).  According to the Policy in effect in

13  2008, an entire Cow Palace parking lot could be rented to a promoter or vendor to develop revenue.

14  JSUF at 1.  The Circus contracted to perform in the Cow Palace's Upper Parking Lot from

15  September 12, 2008 through September 14, 2008.  License Agr. ¶ 1.  The Circus pitched its big top

16  tent in the Upper Parking Lot of the Cow Palace itself as opposed to occupying the brick and mortar

17  structure of the Cow Palace. License Agr. ¶ 2.

18    On September 12, 2008, Bolbol and Mark Ennis ("Ennis"), also a member of CCFE, went to

19  the Cow Palace to distribute leaflets to the Circus' patrons and to videotape the animals at the

20  Circus.  Upon their arrival, Bolbol and Ennis proceeded to distribute their informational leaflets to

21  patrons in and around the Circus' tent and to videotape some of the Circus' animals.  At some point

22  during the evening, Bolbol and Ennis were approached by employees of the Circus, who wanted to

23  comment on Bolbol and Ennis' opposition to the use of animals in circus entertainment.  The Circus'

24  employees took Bolbol and Ennis to the back of the big top tent where Bolbol noticed the Circus'

25  elephants within 15 feet of her.  Bolbol also noticed that the area surrounding the tent was

26  barricaded.

27

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Pursuant to Bolbol and Ennis' interaction with the Circus' employees, the Daly City Police

2   Department was summoned at some point, and an officer arrived upon the scene.  Bolbol asked the

3   officer if the barricades were legal because she wanted to access the area in order to videotape the

4   condition and treatment of the animals used by the Circus.  The officer summoned a supervisor to

5   the scene and shortly thereafter, Officer Griggs of the DCPD arrived.  After some discussion, Officer

6   Griggs suggested that the barricade could be placed more appropriately in order to accommodate

7   both sides. Docket No. 41 (Leigh Dec.), Exh. E (Griggs Depo.) at 121:5-8.  Bolbol and Ennis walked

8   away from the conversation with a belief that they could legally access the area surrounding the tent

9   and behind the barricades in order to engage in their speech activity.  For the remainder of the

10  evening, Bolbol and Ennis went beyond the barricades and videotaped the animals.

11  On September 13, 2008, Bolbol and Ennis returned to the Cow Palace to continue to engage

12  in their speech activity, including to videotape the Circus' handling and the condition of the animals.

13  Bolbol once again noticed the barricades and concluded that the Circus had not placed them in

14  accordance with her perception of Officer Griggs' directions from the previous night.  Rather, the

15  barricades cut off from public access more territory surrounding the Circus' tent than had been

16  accorded the previous night pursuant to Officer Grigg's directions.  Nonetheless, as they had done

17  the night before without incident, Bolbol and Ennis went beyond the barricades, which cut off public

18  access to a large swath of the Upper Parking Lot, in order to continue filming the animals.  Once

19  again, Bolbol and Ennis were confronted by some of the Circus' employees, who attempted to

20  interrupt Bolbol and Ennis' attempts to videotape the animals.

21  On September 13, 2008, Officer Kranz was on patrol and responded to a call for assistance at

22  the Cow Palace from Christine Hanley, Lead Humane Investigator.  Docket No. 35-10 (Hanley

23  Dec.) ¶ 11.  When Kranz arrived at the Cow Palace, the Cow Palace Event Coordinator, Valery Ann

24  Luxamana ("Luxamana"), informed him that there were animal rights protesters behind the Circus'

25  tent in an area that was not open to the public. Docket No. 41 (Leigh Decl.), Exh. D (Kranz Depo.)

26  39-41.  Luxamana also told Kranz that the protesters were not authorized to be there. Kranz Depo. at

27

28

3

**United States District Court**
For the Northern District of California

41.  The Cow Palace's Rentals & Operations Officer, Diana Colvin, confirmed this information and escorted Kranz in a golf cart to the area in question behind the Circus' tent. Kranz Depo. at 40.

Bolbol and Ennis were still engaged with the Circus' employees when Bolbol noticed an electric vehicle drive behind a truck near to where she and Ennis stood.  Officer Kranz stepped down from that vehicle.  Officer Kranz was in full uniform, but he did not identify himself as a police officer.  Kranz immediately advanced upon Ennis physically without first attempting to engage Ennis or Bolbol verbally.  A tussle ensued between Ennis and Kranz during which time the two struggled with the unipod camera that Ennis carried.  Ennis broke away from the struggle, and Kranz next advanced upon Bolbol.  Subsequently, Kranz and Bolbol became engaged in a physical confrontation.  The two ended up against the electric vehicle, at which time Kranz took hold of Bolbol's hand that held the camera and began to hit the hand against the vehicle.  As a result, the battery fell out of Bolbol's camera.  Kranz then held Bolbol's hand in a "pain-compliance" hold for approximately 15-20 minutes until additional DCPD officers arrived on the scene.  Upon the arrival of the back-up officers, Bolbol was then handcuffed and placed in the back of a DCPD police car for approximately 45 minutes.  Bolbol complained of injuries to her finger, and a paramedic was summoned to treat her hand.  Incident to this detention, Officer Kranz seized Bolbol's belongings, including a video camera and battery, a video camera unipod, one unused videotape, one used videotape containing, *inter alia*, Bolbol's recordings from the day and one cell phone.  Bolbol was taken to the DCPD and kept there for approximately 2-3 hours.  When she was released, she was not given a receipt for the seized belongings.

Plaintiff filed a Complaint on May 4, 2009, alleging twelve causes of action and seeking compensatory damages, injunctive and declaratory relief, civil penalties and punitive damages. Docket No. 1 (Complaint).  Specifically, the complaint alleges: (1) a violation of 42 U.S.C. § 1983 based on a violation of plaintiff's First Amendment right to free speech; (2) a violation of plaintiff's state Liberty of Speech rights pursuant to Art.1, Section 2(a) of the California constitution; (3) a violation of 42 U.S.C. § 1983 based on a violation plaintiff's right against unlawful seizure under the Fourth Amendment; (4) a violation of plaintiff's right against unlawful seizure under Art. 1, Section

4

13 of the California constitution; (5) a violation of plaintiff's right against false arrest/false imprisonment as defined by California Penal Code § 236; (6) a violation of 42 U.S.C. § 1983 based on a violation of the Equal Protection Clause of the 14th Amendment; (7) a violation of plaintiff's rights under California's Equal Protection Clause, Art. 1, Section 7(a); (8) a violation of California Penal Code § 4003; (9) a violation of 42 U.S.C. § 1983 based on a violation of plaintiff's rights against excessive force under the Fourth Amendment; (10) a violation of 42 U.S.C. § 1983 based on a violation of plaintiff's right against illegal seizure of property under the Fourth Amendment; (11) a violation of California Civil Code § 51.7; and (12) a violation of California Civil Code § 52.1.  The defendants now move for summary judgment, or in the alternative, partial summary judgment as to all actions.

LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-55 (1986).  A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.  The court may not make credibility determinations. *Id.* at 255.  The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e); *see Anderson*, 477 U.S. at 250.

**United States District Court**
For the Northern District of California

1    DISCUSSION[2]

2        Firstly, the court considers plaintiff's federal constitutional claims in light of defendants'

3    assertion of qualified immunity.  The court finds that defendant Kranz is entitled to qualified

4    immunity as to plaintiff's First Amendment claim, that he is not entitled to qualified immunity as to

5    plaintiff's Fourth Amendment claims, and that the court need not consider qualified immunity as to

6    plaintiff's 14th Amendment claim because the plaintiff concedes that there is no evidence to support

7    the allegation.  Secondly, the court considers plaintiff's federal claims against Chief McLane and the

8    City and finds that the evidence does not support liability as to either defendant.  Thirdly, the court

9    considers plaintiff's state law-based claims.  The court finds that plaintiff's evidence does not

10   support her claims under Cal. Civ. Code § 4003, Cal. Civ. Code § 51.7 and the Equal Protection

11   Clause of the state constitution, Art. 1, Section 7(a).  The court does find that the evidence supports

12   plaintiff's claims under the state Liberty of Speech Clause, Art. 1, Section 2(a), the state unlawful

13   seizure clause, Art. 1, Section 13, Cal. Pen. Code § 236 and Cal. Civ. Code § 52.1.

14       Lastly, the court considers plaintiff's motion to consolidate the related case and for leave to

15   file a First Amended Complaint.  The court orders that the cases in question be consolidated and

16   grants plaintiff leave to file within 20 days of this order a Proposed First Amended Complaint

17   consistent with the court's conclusions here, adding new City defendants and additional claims.

18   Pending its review of the Proposed First Amended Complaint, the court will determine whether

19   plaintiff may add new claims to this action.

20   I.    Defendant's Motion for Summary Judgment

21       A.    Federal Claims - Qualified Immunity

22       Defendants move for summary judgment as to plaintiff's federal constitutional claims against

23   Kranz, the arresting officer.  Specifically, defendants assert that Kranz is entitled to qualified

24   immunity.  "A finding of qualified immunity depends on a two-part inquiry by the court." *Peng v.*

25   *Mei Chin Penghu*, 335 F.3d 970, 976 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201

26   (2001)).  The court must determine whether the facts alleged, "taken in the light most favorable to

27   the party asserting the injury," show the violation of a constitutional right, and whether the right was

28

6

United States District Court

For the Northern District of California

1    clearly established at the time of the violation. *Id*; *see Blankenhorn v. City of Orange*, 485 F.3d 463,

2    471 (9th Cir. 2007) (citing *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004)

3    ("Defendants are entitled to such relief only if the facts alleged and evidence submitted . . . show

4    that their conduct did not violate a federal right; or, if it did, the scope of that right was not clearly

5    established at the time."))  In analyzing the two-pronged qualified immunity standard, the court may

6    consider either prong first, however "it is often beneficial" to determine whether a constitutional

7    right was violated prior to considering whether the scope of the right was clearly established.

8    *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009) ("The judges of the district courts and the courts of

9    appeal should be permitted to exercise their sound discretion in deciding which of the two prongs of

10   the qualified immunity analysis should be addressed first in light of the circumstances in the

11   particular case at hand.").  Accordingly, as to each of the five federal claims against which qualified

12   immunity may be invoked the court considers firstly whether Kranz violated plaintiff's

13   constitutional rights and secondly whether the scope of each right was clearly established.

14               1.    Violation of Constitutional Right

15                     a.    Free Speech Claims

16        Plaintiff alleges that defendants violated her free speech rights pursuant to both the federal

17   and state constitutions.  Specifically, plaintiff asserts that the area surrounding the Circus' big top

18   tent, which was pitched in the Upper Parking Lot of the Cow Palace, was improperly barricaded

19   with respect to her free speech rights.  Consequently, plaintiff alleges that in enforcing the barricade

20   and arresting plaintiff for trespass as plaintiff attempted to videotape the animals, Kranz violated her

21   free speech rights under section 1983 and under the state constitution.  The court considers

22   plaintiff's federal and state free speech claims together because the rights are largely coextensive,

23   with California's Liberty of Speech Clause providing broader protections than the First Amendment.

24   *See Kuba v. 1-A Agr. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) (citing *Los Angeles Alliance for*

25   *Survival v. City of Los Angeles*, 22 Cal.4th 352 (2000)).

26        Under Art. 1, Section 2(a) of the California constitution, protected speech may be limited in a

27   public forum provided that the restriction is content-neutral, is narrowly-tailored to serve an

28
                                                    7

1  important government interest and leaves open ample alternative channels for the communication of

2  the message. *Kuba*, 387 F.3d at 856 (citing *Galvin v. Hay*, 374 F.3d 739, 746 (9th Cir. 2004)).  Here,

3  the parties do not dispute that videotaping the Circus' animals is protected speech.  The parties do

4  dispute whether the Upper Parking Lot, as used by the Circus to pitch its big top tent, and

5  specifically the area of the Upper Parking Lot not physically occupied by the big top tent,

6  constituted a public forum.

7       For the purposes of the state constitution, parking lots associated with public entertainment

8  venues are generally considered public fora. *Id.* at 857-58 ("We hold that protest activity is not

9  inherently incompatible with the activity to which the parking lots and walk-ways outside the Cow

10 Palace are dedicated, and that those areas are therefore public fora for purposes of California Liberty

11 of Speech Clause analysis.").  The parties do not dispute that *Kuba* applies to the Upper Parking Lot

12 when it is used as a traditional parking lot to the brick and mortar Cow Palace building.  In this case,

13 however, the Cow Palace rented the Upper Parking Lot to the Circus to pitch its big top tent.  Thus

14 the entertainment venue itself was located in the parking lot.  Accordingly, the defendants argue that

15 the Upper Parking Lot's general status as a public forum changed here because it was rented to

16 house the entire traveling Circus. Docket No. 35 (Defendant's Motion ("Def. Memo.")) at 13.

17 Plaintiff argues that notwithstanding this fact, the Upper Parking Lot remained a public forum per

18 *Kuba*, and that the placement of the barricades was not narrowly tailored to accomplish the

19 government's interest in promoting public safety. Docket No. 43 (Plaintiff's Opposition  ("Opp.

20 Memo.")) at 19-21.  Thus the court first considers whether the Upper Parking Lot as used by the

21 Circus in this case was a public forum.

22      In California, the test for determining whether a place is a public forum is whether "the

23 communicative activity [at issue] is basically incompatible with the normal activity of a particular

24 place at a particular time." *Kuba*, 387 F.3d at 857.  Accordingly, the court addresses whether

25 plaintiff's videotaping was incompatible with the normal activity occurring within the barricaded

26 area of the Upper Parking Lot as used by the Circus on this occasion.

27

28

1    Defendants argue that the entire area within the barricades was restricted to the public per the

2    mandate of the fire marshal and in light of "other public safety and privacy considerations." Def.

3    Memo. at 3.  Defendants refer to the presence of electrical wiring, Circus performers and animals,

4    Circus equipment, vehicles and other Circus property within the barricaded area to suggest that the

5    normal activity within the barricaded area created a hazard for the public.  However, plaintiff's

6    documentary evidence does not support the defendants' contention that the normal activity in the

7    barricaded portion of the Upper Parking Lot surrounding the Circus' tent was incompatible with the

8    plaintiff's exercise of her speech rights.  The evidence shows that the area in question constituted a

9    relatively large open space, populated, as defendants assert, by Circus performers, Circus animals,

10   other unidentified persons and some parked vehicles.  Docket No. 41 (Leigh Dec.), Exh. A. (DVD

11   Clips) 6-8.  There is no indication, however, that the presence of two individuals videotaping the

12   activity of the animals was incompatible with what appeared to be occurring.  Plaintiff's

13   supplemental evidence reiterates that the area in question was somewhat sparsely populated by

14   Circus equipment, vehicles, animals, etc., as well as populated by various persons who may or may

15   not have been associated with the Circus.  Docket No. 80 (Plaintiff's Supplemental Evidence).

16   Defendant's supplemental evidence includes nighttime photos in which it is very difficult to discern

17   the normal activity in the barricaded portion of the Upper Parking Lot surrounding the Circus' tent,

18   but at least one photo reveals a baby stroller within the barricaded area. Docket No. 84 (Defendants'

19   Supplemental Evidence), Exh. 2 at 15.  Defendants' evidence does not show or explain why the

20   plaintiff's speech activity was in fact incompatible with the Circus' normal use of the barricaded

21   area in question.  Accordingly, viewing the evidence in the light most favorable to the plaintiff, the

22   court finds that the presence of two animal-rights activists videotaping the Circus' animals was not

23   incompatible with the normal activity within the barricaded portion of the Upper Parking Lot

24   surrounding the Circus' tent, and the area in question is a public forum for free speech purposes.

25   Consequently, any restrictions in the barricaded area must pass "constitutional muster." *Kuba*, 387

26   F.3d at 857.

27

28

9

1    Restrictions pass constitutional muster "provided [they] 'are justified without reference to the

2    content of the regulated speech, that they are narrowly tailored to serve a significant governmental

3    interest, and that they leave open ample alternative channels for communication of the

4    information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for*

5    *Creative Non-Violence*, 468 U.S. 288, 293 (1984)).  Plaintiff suggests that the restriction in question

6    , *i.e.*, the placement of the barricades, was not in fact content-neutral but rather was effected and

7    enforced as a means of preventing her from exercising her free speech right to videotape the Circus'

8    animals.  Defendants counter that the Circus placed the barricades in order to create a fire lane

9    encircling the big top tent in accordance with the mandate of the fire marshal, and that all members

10   of the public were restricted.  Plaintiff does not dispute this assertion nor does plaintiff present any

11   other evidence from which the trier of fact could reasonably infer that either the restriction or Officer

12   Kranz's enforcement of it was content-based.  Accordingly, the court concludes that the restriction

13   was content-neutral.

14   Defendants bear the burden of showing that a content-neutral restriction is narrowly tailored

15   to serve an important government interest. *See Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863

16   (9th Cir. 2001).  In referencing the fire marshal's alleged mandate as the Circus' primary reasoning

17   for the placement and enforcement of the barricades, defendants implicitly identify public safety as

18   the important government interest, and plaintiff does not dispute this point.[3]  The parties do dispute

19   whether the placement of the barricades, and the restriction on speech behind the barricades, was

20   narrowly tailored to achieve the government's interest in public safety.  Specifically, plaintiff

21   presents evidence that on the day prior to the incident in question, at least one Daly City Police

22   Officer questioned the legality of the Circus' placement of the barricades and suggested that the

23   Circus reposition them in order to comport with the law. Griggs Depo. at 121:5-8.  Apart from

24   asserting, without any documentation, that the fire marshal mandated the specific placement of the

25   restrictions, defendants do not offer any evidence that the government's interest in safety could not

26   have been accomplished less restrictively.  Neither have defendants presented evidence that the

27   restriction left open ample alternatives for the plaintiff to engage in the specific form of speech

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    namely, videotaping the animals at close range.  Accordingly, the court concludes that for state

2    Liberty of Speech purposes, the evidence presented does not call into question plaintiff's assertion

3    that the restriction here was not narrowly tailored to achieve the government's interest in public

4    safety.

5           Under First Amendment analysis, the nature of the forum as either a traditional public forum,

6    a designated public forum or a nonpublic forum dictates the degree to which the government may

7    restrict speech. *Cornelius v. NAACP Legal Defense and Educational Fund*, 473 U.S. 788, 802

8    (1985).  A place is considered a traditional public forum if "by long tradition or by government fiat

9    [a place has] been devoted to assembly and debate . . ." *Perry Educ. Ass'n. v. Perry Local*

10   *Educator's Ass'n.*, 460 U.S. 37, 45 (1983).  Neither party contends that the Upper Parking Lot of the

11   Cow Palace as used here is a traditional public forum, however the parties dispute whether the

12   Upper Parking Lot as rented to the Circus was a designated public forum.

13          A designated public forum is a place not traditionally public but designated by the

14   government as public. *Int'l Soc. for Krishna Consciousness, Inc. v Lee*, 505 U.S. 672, 678-79

15   (1992).  In identifying a place as a designated public forum, the court must consider whether: (1) it is

16   the practice and policy of the government to open a non-traditionally public place to assembly and

17   debate; and (2) the nature of the place and whether the place is compatible with expressive activity.

18   *Cornelius*, 473 U.S. at 802.  Defendants assert that the Upper Parking Lot was not a designated

19   public forum because it was rented in its entirety to a private Circus, subject to the Cow Palace's

20   License Agreement and First Amendment Expression Policy.  Def. Memo. at 13.  By this assertion,

21   however, defendants appear to concede that the Upper Parking Lot was in fact a designated public

22   forum.  The application of the Policy to the License Agr. works to show that the government, here

23   the Association, intended that the Upper Parking Lot remain open to assembly and expression.

24   Indeed, in renting the Upper Parking Lot to the Circus subject to the Policy, the Association

25   manifested its intent that the Upper Parking lot remain open to speech.  The second prong of the

26   analysis - the nature of the place and whether the place is compatible with expressive activity -  is

27   coextensive with the California constitutional test for compatibility.  Consequently, given the court's

28

United States District Court

For the Northern District of California

1  conclusion above that the proffered evidence does not support a finding that plaintiff's videotaping

2  activity was incompatible with the normal activity in the restricted area, the court finds that as to

3  plaintiff's federal constitutional claim the barricaded portion of the Upper Parking Lot surrounding

4  the Circus' tent contained a designated public forum.

5          Under the First Amendment, the government may limit content-neutral speech in a

6  designated public forum as long as the restriction is narrowly tailored to serve a significant

7  government interest and leaves open ample alternative channels of communication. *Perry*, 460 U.S.

8  at 45.  Because the standard is identical to the standard applied above in the context of the state

9  constitution, the court finds that under federal law the placement of the barricades on September 13,

10  2008 was not narrowly tailored to achieve the government's interest in public safety.

11                            b.     Unlawful Seizure-False Arrest

12          Plaintiff was arrested for trespass pursuant to a citizen's arrest.  Plaintiff alleges that

13  defendants violated her Fourth Amendment right against unlawful seizure because Officer Kranz did

14  not have independent probable cause to arrest her pursuant to a citizen's arrest.  Under the federal

15  constitution, a law enforcement officer must have probable cause to make a warrantless arrest.

16  *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).  "The test [under federal law] for whether probable cause

17  exists is whether 'at the moment of arrest the facts and circumstances within the knowledge of the

18  arresting officers and of which they had reasonably trustworthy information were sufficient to

19  warrant a prudent [person] in believing that the petitioner had committed or was committing an

20  offense.'" *United States v. Jensen*, 425 F.3d 698, 704 (9th Cir. 2005) (citing *United States v.*

21  *Bernard*, 623 F.2d 551, 559 (9th Cir. 1980).  Where the officer makes an arrest pursuant to a

22  citizen's arrest, however, "the federal Constitution requires police officers to have independent

23  probable cause when effectuating a citizen's arrest." *Hopkins v. Bonvicino*, 573 F.3d 752, 774 (9th

24  Cir. 2009); *Arpin v. Santa Clara Valley Trans. Agcy.*, 261 F.3d. 912, 925 (9th Cir. 2003) ("In

25  establishing probable cause, officers may not solely rely on the claim of a citizen witness that he was

26  a victim of a crime, but must independently investigate the basis of the witness' knowledge or

27  interview other witnesses.").  Moreover, "[a] sufficient basis of knowledge is established if the

28                                        12

1   victim provides 'facts sufficiently detailed to cause a reasonable person to believe a crime had been

2   committed and the named suspect was the perpetrator.'" *See Peng*, 335 F.3d at 978 (quoting *Fuller*

3   *v. MG. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991)). The court now addresses whether Kranz had

4   independent probable cause to take Bolbol into custody pursuant to a citizen's arrest.

5        Officer Kranz was on duty the evening of September 13, 2008 and responded to a trespass

6   call from Humane Investigator Hanley indicating that two individuals were trespassing at the Circus.

7   Upon arriving at the Cow Palace and after briefly conferring with Circus officials, Kranz was driven

8   to the location behind the tent where Bolbol and Ennis were engaged by some the Circus'

9   employees. He saw Bolbol and Ennis behind the barricades in the restricted area and approached

10  them. The facts hereafter are in great dispute, but for the purposes of this motion they must be

11  resolved in a manner favorable to the plaintiff. The plaintiff asserts that Kranz merely accepted the

12  Circus employees' account that she and Ennis were trespassing, and that he failed to investigate the

13  matter independently on the scene. Plaintiff alleges that upon his arrival in the area behind the tent,

14  Kranz immediately and physically confronted Ennis, attempting to wrest Ennis's camera from his

15  hand before turning his sights on Bolbol and her camera. Plaintiff's evidence suggests that Kranz

16  did not investigate the matter of the alleged trespass until after he had arrested Bolbol. Kranz Depo.

17  at 50-53. Thus, plaintiff asserts that Kranz did not have probable cause to arrest her for trespass

18  because he made no effort to investigate independently upon his arrival on the scene whether

19  probable cause existed as to the Circus' trespass charge and request that he effectuate a citizen's

20  arrest. *See Hopkins*, 573 F.3d at 774.

21       Plaintiff further asserts that had Kranz independently investigated the issue of probable

22  cause, he could only have reasonably concluded that there was no basis for a citizen's arrest in light

23  of the state trespass statute. Plaintiff points to California's trespass statute codified at Cal. Pen.

24  Code § 602. Specifically, Section 602(m) prohibits the "[e]ntering and occupying [of] real property

25  or structures of any kind without the consent of the owner, the owner's agent, or the person in lawful

26  possession," and requires that the occupation reflect the party's intent to "remain permanently, or

27  until ousted" or "to dispossess anyone from the property." *People v. Wilkinson*, 248 Cal.App.2d

28

13

United States District Court

For the Northern District of California

Supp. 906, 908 (1967).  Defendants argue that the Circus employees' statements as to Ennis and Bolbol's alleged trespass as well as Bolbol and Ennis' mere presence behind the barricades were enough to provide Kranz with independent probable cause that a citizen's arrest pursuant to a violation of 602(m) was reasonable.  Plaintiff, however, highlights the case law to assert that given the plain meaning of 602(m), it was clear to the reasonable observer, and certainly to the reasonable peace officer, that Bolbol and Ennis had no intention to remain permanently or until ousted.  The court finds that given the language and case law interpreting Cal. Pen. Code § 602(m), Officer Kranz could not have had probable cause to believe that Bolbol and Ennis intended to violate that specific provision of the trespass statute. *See Edgerly v. City and County of San Francisco*, 599 F.3d 946, 955 (9th Cir. 2010) (finding that a reasonable officer would not have had probable cause to believe that the defendant had committed a trespass per section 602(m) because there was no evidence that his presence was "nontransient" or "continuous.").  Indeed, plaintiff contends that any effort on Kranz's part to conduct an independent investigation would have revealed that the plaintiff's alleged actions could not have satisfied the plain meaning of the statute.  Plaintiff's documentary evidence shows that Kranz did not in fact stop to take stock of the situation at the scene of the alleged trespass or to investigate the Circus employees trespass claims once he reached the site.  Rather, he immediately advanced physically on Bolbol and Ennis. DVD Clips at 6.

Viewing the facts in the light most favorable to plaintiff, the court concludes that there is sufficient evidence to raise a material question of fact whether Officer Kranz conducted any independent investigation of the scene prior to effectuating the citizen's arrest.  Accordingly, the court declines to determine the issue of probable cause, and summary judgment as to this claim is denied.

c.    Illegal Seizure of Property

Plaintiff alleges that Officer Kranz's seizure of her personal belongings,  including her video camera and cellular phone, incident to her arrest was a civil rights violation.  "The simple language of the [Fourth] Amendment applies equally to seizures of persons and to seizures of property." *Payton v. New York*, 445 U.S. 573, 585 (1980).  "The seizure of property in plain view involves no

14

1    invasion of privacy and is presumptively reasonable, assuming that there is probable cause to

2    associate the property with criminal activity." *Id.* at 586.  Where, however, the arrest is illegal for

3    lack of probable cause, the seizure of personal belongings incident to that arrest is patently

4    unreasonable and a constitutional violation.  Given the discussion above regarding Kranz's potential

5    lack of probable cause to arrest plaintiff pursuant to a citizen's arrest, the court concludes that

6    summary judgment as to this claim is inappropriate at this point.

                                        d.    Excessive Force

8        Plaintiff alleges that defendant Kranz used excessive force in his attempt to subdue her while

9    he waited for additional DCPD officers to arrive.  Bolbol alleges that Kranz placed her finger in a

10   "pain-compliance" hold for approximately 15-20 minutes. Bolbol Dec. ¶ 31.  This resulted in Bolbol

11   experiencing enough pain to believe that Kranz had broken her finger.  After Bolbol was placed in

12   the DCPD squad car, a medic was summoned to treat her hand. *See* Defendants' Supplemental

13   Evidence, Exh. 2 at 3.

14       "A claim against law enforcement officers for excessive force is analyzed under the Fourth

15   Amendment's 'objective reasonableness' standard." *Arpin*, 261 F.3d at 921 (citing *Graham v.*

16   *Connor*, 490 U.S. 386, 388 (1989)).  Under the Fourth Amendment, a police officer may "use only

17   an amount of force that is objectively reasonable in light of the circumstances facing [the officer]."

18   *Blankenhorn*, 485 F.3d at 477 (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)).  "The

19   reasonableness of a particular use of force must be judged from the perspective of a reasonable

20   officer on the scene, rather than with the 20/20 vision of hindsight." *Arpin*, 261 F.3d at 921 (quoting

21   *Graham*, 490 U.S. at 396)).  Moreover, "an excessive force analysis requires evaluating 'the severity

22   of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

23   others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.*  "The

24   absence of probable cause does not grant an individual the right to offer resistance." *Id.* (citing

25   *United States v. Span*, 970 F.2d 573, 580 (9th Cir. 1992)).  "An individual's limited right to offer

26   reasonable resistance is only triggered by an officer's bad faith or provocative conduct." *Id.*

27

28                                                    15

United States District Court
For the Northern District of California

1    Once again, there is considerable dispute between the parties as to the facts underlying this

2    issue.  However, the facts must be viewed in the light most favorable to the non-moving party, here

3    the plaintiff.  Plaintiff's documentary evidence shows Officer Kranz initiating the struggle between

4    himself and Ennis and subsequently between himself and Bolbol. DVD Clips 6-8.  Notwithstanding

5    Kranz's claims to the contrary, the evidence shows that neither Ennis nor Bolbol swung their

6    cameras at Kranz, and consequently it does not support defendants' contention that Bolbol and Ennis

7    created an atmosphere in which Kranz could have reasonably determined that it was necessary to use

8    the level of force that he used to subdue and detain Bolbol.  Kranz Depo. 69-70.  Rather, plaintiff's

9    documentary evidence undermines the defendants' claim that Kranz felt justifiably threatened in the

10   situation and applied the "pain compliance" hold in order to subdue a hostile Bolbol. Kranz Depo.

11   69-70.

12   Furthermore, plaintiff's evidence undermines Kranz's claims that Bolbol resisted arrest,

13   requiring him to engage her violently against the side of the electric cart and subsequently place her

14   in the pain-compliance hold.  Bolbol asserts, and her evidence supports, that she did not resist arrest

15   making Kranz's application of the "pain-compliance" hold on her finger for 15 to 20 minutes

16   unreasonable in light of the circumstances. Bolbol's Dec. ¶ 32.  Accordingly, summary judgment is

17   denied as to the claim of excessive force.

18                          e.        Equal Protection Claims

19   Notwithstanding submitting an oversized opposition brief without seeking leave from the

20   court to do so, plaintiff does not challenge defendants' assertion that she cannot demonstrate a

21   violation of her equal protection rights under either federal or state law.  Neither has plaintiff

22   submitted any evidence from which a jury could reasonably find that Kranz discriminated against

23   her on the basis of her protected speech.  Thus, the defendants are granted summary judgment with

24   respect to plaintiff's sixth and seventh causes of action.

25                   2.        Clearly Established Law

26   In sum, viewing the evidence in the light most favorable to plaintiff, the court finds evidence

27   from which the trier of fact could reasonably find constitutional violations of plaintiff's federal free

28

16

United States District Court

For the Northern District of California

speech right, and Fourth Amendment rights against unlawful seizure/false arrest, seizure of property and use of excessive force. Continuing the qualified immunity analysis, the court next determines whether the rights violated were clearly established at the time of the incident. "'[I]f a [constitutional] violation could be made out on a favorable view of the parties' submissions, the next sequential step is to ask whether the right was clearly established' at the time of the arrest. *Blankenhorn*, 485 F.3d at 480-481 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "[P]olice officers 'can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Blankenhorn*, 485 F.3d at 481 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "The key inquiry is whether a reasonable person could have believed his actions lawful at the time they were undertaken." *Bull v. City and County of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (citing *Anderson v. Creighton*, 483 U.S. 635, 646 (1987)).

a.    First Amendment Claim

Plaintiff argues that Kranz is not entitled to qualified immunity because the law after *Kuba* was clearly established as to the public forum status of an entertainment venue's parking lot. *Kuba*, 397 F.3d at 857-58 (9th Cir. 2004); Opp. Memo. at 19. The holding in *Kuba*, however, did not clearly address whether the public forum status of a parking lot associated with an entertainment venue would change if the parking lot itself functions as the entertainment venue. In coming to its decision in *Kuba*, the Ninth Circuit considered whether the public was "'free to come and go' in the parking lot[]" and the degree to which the public could "'travel[] over the parking lot . . . to attend . . . events or exhibitions.'" *Kuba*, 387 F.3d at 857 (quoting *Carreras v. City of Anaheim*, 768 F.2d 1039, 1042 (9th Cir. 1985)). In this case, the Circus was located in the Upper Parking Lot and the public was not completely free to come and go, nor completely free to travel across the area in question to attend the Circus. In addition, a search of case law suggests that the law as to a parking lot used in this manner was not clearly established at the time of the incident. Accordingly, the court

United States District Court

For the Northern District of California

1   concludes that Kranz could reasonably have believed that his enforcement of the Circus' barricades

2   as against the animal-rights activists was not a violation of plaintiff's free speech rights given the

3   state of the law at the time of the incident, and the court finds that as to plaintiff's federal free speech

4   claim, Kranz is entitled to qualified immunity.

5                                b.        Fourth Amendment Seizure Claims

6          Defendants argue that Kranz is entitled to qualified immunity as to plaintiff's Fourth

7   Amendment seizure claims because Kranz had probable cause to detain and arrest Bolbol pursuant

8   to the citizen's arrest, and the seizure of her belongings was reasonable as a seizure incident to a

9   lawful arrest.  In determining whether Kranz lacked probable cause to effectuate Bolbol's arrest

10  pursuant to a citizen's arrest, the court considers whether *Arpin's* rule (that "the federal Constitution

11  requires police officers to have independent probable cause when effectuating a citizen's arrest,"

12  *Hopkins*, 573 F.3d at 774) was clearly established at the time of the arrest.  The 9th Circuit has held

13  that as of 2003, *Arpin's* rule was not clearly established law. *Id.* at 775.  In coming to this

14  conclusion, the *Hopkins* panel looked to case law as of 2003, the date of the incident in question

15  there, and determined that few courts had applied *Arpin's* rule.  As of 2008, the relevant date here,

16  several courts have cited to *Arpin* for the proposition that federal law requires law enforcement

17  officers to have independent probable cause before effectuating a citizen's arrest. *Id.* at 775-76

18  (stating additionally that discussion in unpublished opinions was relevant to the clearly established

19  right prong where the opinions are issued prior to the underlying conduct.)[4]  Accordingly, the court

20  concludes that *Arpin's* rule was clearly established at the time of Bolbol's arrest.  With respect to the

21  illegal seizure of Bolbol's property, it necessarily follows then that if the law as to Kranz's lack of

22  probable cause to arrest pursuant to a citizen's arrest was clearly established, then the law

23  proscribing seizure of property incident to such an arrest was also clearly established. *Payton*, 445

24  U.S. 573, 586 (1980) ("The simple language of the [Fourth] Amendment applies equally to seizures

25  of persons and to seizures of property.").  Moreover, even if the evidence supported an inference that

26  Kranz had investigated the citizen's arrest prior to seizing Bolbol, as discussed above, the evidence

27  does not support an inference that Bolbol had violated state trespass law.  Given the language and

28

                                                18

1   interpretation of section 602(m), there was no basis upon which Kranz could have believed that

2   Bolbol and Ennis intended to remain permanently in the area of the alleged trespass. *See Wilkinson*,

3   248 Cal.App.2d Supp. at 908.  Because an issue of material fact remains in regard to the issue of

4   probable cause to effectuate a citizen's arrest, and because even if the issue of probable cause was

5   resolved in Kranz's favor there was no basis to believe that plaintiff committed a violation of

6   602(m), the court finds that Kranz is not entitled to qualified immunity as to Bolbol's Fourth

7   Amendment seizure claims.

8                              c.       Fourth Amendment - Excessive Force

9          "In assessing the state of the law at the time of [Bolbol's] arrest, we need look no further

10  than *Graham's* holding that force is only justified when there is a need for force." *Blankenhorn*, 485

11  F.3d at 481 (concluding that the state of the law as to the reasonable use of excessive force by a

12  police officer was clearly established at the time of the incident in question.)  In *Blankenhorn*, the

13  court found that the police officers' use of force, specifically gang-tackling and punching, was

14  excessive where the "relatively calm" trespass suspect was "not actively resisting arrest." *Id.*  In this

15  case, plaintiff has met her burden of presenting evidence to controvert defendants' assertion that

16  Kranz acted pursuant to his belief that Bolbol and Ennis posed a physical threat to him, and that

17  Bolbol resisted his attempt to arrest her or otherwise interfered in his investigation.  Plaintiff's

18  documentary evidence provides compelling evidence that Kranz was in fact the aggressor, that

19  Bolbol was not a physical threat to him, that she did not interfere with Kranz's alleged attempt to

20  investigate the trespass at the scene, and that she merely resisted Kranz's physical engagement of her

21  by asking him not to touch her.  DVD Clips 6-8.  For these reasons, plaintiff asserts that it was

22  unreasonable for Kranz to apply the pain-compliance hold on her for 15 to 20 minutes.  While

23  placing a finger in a pain-compliance hold does not constitute the same level of force as gang-

24  tackling or punching, it was unreasonable in light of the circumstances in which Officer Kranz found

25  himself.  Considering these facts and the state of the law, Bolbol's Fourth Amendment right against

26  the use of  excessive force was clearly established, and the court finds that as to the charge of

27

28

1   excessive force, Kranz is not entitled to qualified immunity.  Kranz had "sufficiently clear notice

2   that [his] conduct could have been unconstitutional." *Blankenhorn*, 485 F.3d at 481.

3           B.      Claims Against McLane

4           Plaintiff seeks to hold Police Chief McLane liable, in his official and individual capacities,

5   for Kranz's violation of her federal civil rights.  However, "government officials may not be held

6   liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior."

7   *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009). "'[T]he term supervisory liability is a misnomer,'

8   since 'each Government official, his or her title notwithstanding, is only liable for his or her own

9   misconduct.'" *Simmons v. Navajo County, Arizona*, 609 F.3d 1011, 1020 (9th Cir. 2010) (citing

10  *Iqbal*, 129 S.Ct. at 1948)).  "To survive summary judgment, [plaintiff] must adduce evidence that

11  [defendants] themselves acted or failed to act unconstitutionally, not merely that a subordinate did."

12  *Id.* at 1020-21.  Thus, McLane may only be held individually liable "for his own culpable action or

13  inaction in the training, supervision, or control of his subordinates; for his acquiescence in the

14  constitutional deprivation[;] or for conduct that showed a reckless or callous indifference to the

15  rights of others.'" *Blankenhorn*, 485 F.3d at 485 (citing *Watkins v. City of Oakland*, 145 F.3d 1087,

16  1093 (9th Cir. 1998) (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991))).

17          Plaintiff proffers evidence of a single telephone conversation she had with McLane on the

18  day after her arrest.  During the conversation, McLane allegedly condoned Kranz's actions on the

19  previous day and told Bolbol that if she returned to the site she would be arrested again.  Bolbol

20  Dec. ¶ 41.  Plaintiff claims that the latter action interfered with her speech, causing her "irreparable

21  harm."  The evidence presented, however, does not appear to support Bolbol's assertions as to

22  McLane's liability.  McLane was not present at the Circus, did not participate in any of the events

23  leading up to the incident and spoke with Bolbol only after the incident and without the benefit of a

24  detailed report as to what happened. Leigh Dec., Exh. B (McLane Depo) at 15-20; *see Edgerly v.*

25  *City and County of San Francisco*, 599 F.3d 946, 961 (9th Cir. 2010) ("No reasonable trier of fact

26  could find that [defendant] had any personal involvement in the incident because he was not aware

27  of the arrest or search until after they were completed, when he authorized the Officers to cite and

28

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  release Edgerly.")  Accordingly, there is insufficient evidence to support a claim of McLane's

2  culpability here.

3          In terms of McLane's endorsement of unconstitutional policies, plaintiff refers once again to

4  the brief conversation she had with McLane as evidence that his policies as chief tended to

5  encourage DCPD officers to disregard civil rights law.  McLane Depo. 15-20.  Defendants admit that

6  McLane as police chief had policy-making authority, but plaintiff adduces no evidence that shows

7  that McLane endorsed a policy that led to the routine violation of constitutional rights.  Plaintiff's

8  evidence merely shows that McLane testified that he received an incomplete briefing of the events

9  of September 13, 2008.  McLane Depo. at 15-20.  Then, on September 14, 2008, McLane, under the

10  impression that plaintiff was lawfully arrested for trespass, spoke with plaintiff and told her that if

11  she committed a trespass again, she would be arrested again.  *Id.*  Plaintiff offers no other evidence

12  from which the trier of fact could reasonably conclude that Chief McLane himself acted

13  unconstitutionally or induced his subordinates to act unconstitutionally.  Accordingly, summary

14  judgement as to all claims against McLane is granted in favor of defendant McLane.

15          C.          Claims Against the City of Daly City

16          Plaintiff seeks to hold the City liable for the alleged civil rights violations committed by

17  Kranz.  Specifically, plaintiff cites City's alleged failure to train and the policies established by

18  McLane as direct causes of her alleged injury.  Defendants move for summary judgment as to all of

19  plaintiff's federal claims against the City.

20          "The City may he held liable under section 1983 if its deliberate policy caused the violation

21  alleged." *Blankenhorn*, 485 F.3d at 483 (citing *Monell v. Dep't of Social Services of New York*, 436

22  U.S. 658, 694 (1978)).  In order to establish a failure to train against a municipality, the plaintiff

23  "must show that (1) he was deprived of a constitutional right, (2) the City had a training policy that

24  amounts to deliberate indifference to the [constitutional] rights of the person with whom [its police

25  officers] are likely to come into contact; and (3) his constitutional injury would have been avoided

26  had the City properly trained those officers." *Id.* at 484 (citing *Lee v. City of Los Angeles*, 250 F.3d

27  668, 681 (9th Cir. 2001) (internal quotation marks omitted).  Plaintiff proffers evidence only as to

28

21

United States District Court

For the Northern District of California

1    the unconstitutional behavior of Kranz in order to substantiate her failure to train claims.  However,

2    "[f]ailure to train a single officer is insufficient to establish a municipality's deliberate policy."

3    *Blankenhorn*, 485 F.3d at 485.  "'[A]bsent evidence of a program-wide inadequacy in training,' any

4    short-fall in a single officer's training 'can only be classified as negligence on the part of the

5    municipal defendant - a much lower standard of fault than deliberate indifference.'". *Id.* (quoting

6    *Alexander v. City and County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)).  Plaintiff has

7    not met her burden as to this claim.

8         Rather, Bolbol relies heavily on Kranz's actions (Kranz Depo. at 87-88; 123-5; 127-33;

9    143-45; 231-35); on DCPD's several years' worth of  experience dealing with free speech issues as

10   they related to the Cow Palace; and on the fact that Kranz did not uphold her rights several years

11   after the *Kuba* decision as being indicative of a general failure to train.  In apparent contradiction to

12   her claim, however, she also proffers evidence which tends to show that several officers *were* trained

13   in free speech considerations in relation to the Cow Palace.  Specifically, plaintiff refers to Officers

14   Griggs and Gamez's attempts to ensure that the Circus complied with Bolbol and Ennis'

15   constitutional speech rights. Bolbol Decl. ¶¶ 9, 13, 16-17.  This evidence undermines plaintiff's

16   contention that the City systemically failed to train its officers as to the protection of free speech

17   rights at the Cow Palace.  The court finds that more is required here to substantiate plaintiff's claim

18   of municipal liability.  Accordingly, summary judgment is granted in favor of defendants as to

19   plaintiff's federal claims against the City.

20        D.    State Law Claims

21             1.    California Penal Code Section 4003

22        Plaintiff does not challenge defendants' assertion that she has no cause of action regarding

23   California Penal Code Section 4003.  As noted above in regard to plaintiff's federal and state equal

24   protection claims, plaintiff fails to address this issue in her opposition brief and apparently concedes

25   that she may not proceed on this claim.  Accordingly, the court grants summary judgment in favor of

26   defendants as to this claim.

27

28
                                            22

2.      Article 1, Section 13 - Unlawful Seizure/California Penal Code Section

236 - False Arrest

Plaintiff asserts that defendant Kranz unlawfully seized her in violation of Art. 1, Section 13

of the California Constitution and that Kranz committed the tort of false imprisonment as defined by

Cal. Pen. Code § 236. Art.1, Section 13 states: "The right of the people to be secure in their persons,

houses, papers, and effects against unreasonable seizures and searches may not be violated . . ."

Section 236 defines false imprisonment as "the unlawful violation of the personal liberty of

another." The pertinent inquiry in regard to both an unlawful seizure as proscribed in Art.1, Section

13 of the state constitution and to a civil false imprisonment charge as defined by section 236 and as

applied to police officers in arrest situations, is the Fourth Amendment reasonableness standard as

determined by probable cause. "In California, an officer has probable cause for a warrantless arrest

'if the facts known to him would lead a [person] of ordinary care and prudence to believe and

conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'" *Peng*,

335 F.3d at 976 (citing *People v. Adams*, 175 Cal.App.3d 855 (1985)) (citation and internal

quotation marks omitted); *see Knapps v. City of Oakland*, 647 F.Supp.2d 1149, 1165-66) (N.D.Ca.

2009) (James, Mag. J.) (finding that defendant officers were not liable for a section 236 violation

because the seizure was reasonable under the circumstances and not effectuated without "lawful

privilege."))

Where a citizen's arrest is at issue, however, the federal and state requirements for probable

cause, and therefore reasonableness, diverge. "The federal Constitution requires police officers to

have independent probable cause when effectuating a citizen's arrest." *Hopkins*, 573 F.3d at 774.

Under state law, however, "[a] peace officer who accepts custody of a person following a citizen['s]

arrest is not required to correctly determine whether the arrest was justified." *Kesmodel v. Rand*, 119

Cal.App.4th 1128, 1137 (2004) (citing *Kinney v. County of Contra Costa*, 8 Cal.App.3d 761, 768

(1970)); *Arpin*, 261 F.3d at 920-921. Rather, in California, where the citizen's arrest is valid under

state law, the officer effectuating the citizen's arrest may not be held liable. *Id.* (citing Cal. Govt. C.

§ 847(b)). Accordingly, for the purposes of determining both a state constitutional unlawful seizure

23

United States District Court

For the Northern District of California

1    and a state section 236 false imprisonment/false arrest claim, the court addresses whether the

2    underlying citizen's arrest on its own was reasonable, and thus lawful.

3          In California, "[a]ny person, though not an officer, may arrest another for committing or

4    attempting to commit a public offense in his presence." *People v. Bloom*, 185 Cal.App.4th 1496,

5    1501 (2010) (citing Cal. Pen. Code § 837; *People v. Score*, 48 Cal.App.2d 495, 498 (1941)). "The

6    'presence' requirement is found in both sections 836 and 837, and has been liberally construed." *Id.*

7    (citing *People v. Sjosten*, 262 Cal.App.2d 539, 543-544 (1968)). "The 'presence' element relates

8    only to commission of the offense, and not to the proximity of the citizen arrestor at the time of the

9    arrest." *Id.*  Although Gustavo Parra Bello, a Circus official, signed the citizen's arrest form, plaintiff

10   contends that her arrest was in fact initiated by Kranz and Officer O'Rourke without probable cause.

11   Plaintiff alleges that Kranz first seized and detained Bolbol, then discussed her fate with Officer

12   O'Rourke for 15-20 minutes before deciding between himself and Officer O'Rourke to arrest her

13   pursuant to a citizen's arrest.  Kranz Depo. at 147-149.  Plaintiff asserts that Parra Bello's citizen's

14   arrest of her was illegitimate because he did not witness the trespass, he did not report the offense to

15   DCPD or Officer Kranz, and he did not point out Bolbol to Kranz on the scene.  Plaintiff contends

16   that Parra Bello never at any time placed Bolbol under a citizen's arrest nor requested that Kranz

17   arrest Bolbol.  Viewing the facts in the light most favorable to the plaintiff, the citizen's arrest then

18   was not legitimate per state law, and accordingly, Kranz's arrest pursuant to the purported citizen's

19   arrest was not reasonable.  Defendant has proffered evidence to the contrary.  Docket No. 35-11

20   (Parra Bello Dec.).  In his declaration, Parra Bello asserts: "I told the officers that I wanted her

21   arrested for trespassing and I signed the paper in order for that to happen." Parra Bello Dec. at 2.

22   Because the facts here are in dispute, the court finds that whether Kranz arrested Bolbol pursuant to

23   a lawful citizen's arrest under state law, and thus whether Kranz unlawfully seized and falsely

24   imprisoned Bolbol as a matter of state law, is a genuine issue of material fact.  As with the issue of

25   probable cause in relation to plaintiff's federal claims, the court declines to make a determination

26   here pending further consideration of the facts, and summary judgment as to these claims is denied.

27

28

24

1    Moreover, because whether Kranz is entitled to immunity under Cal. Pen. Code § 847(b)(1)

2 rests on whether he had probable cause to believe his seizure/detention was lawful, the court finds

3 that Kranz is not entitled to a finding of immunity under 847(b)(1) at this time.[5] *See Blankenhorn*,

4 485 F.3d at 487 (finding that the defendant officers were entitled to invoke state law-based immunity

5 where "the officers had probable cause to believe [the plaintiff] was trespassing" at the time of

6 arrest.)

7                    3.          California Civil Code Section 51.7

8    Section 51.7 states in relevant part that "[a]ll persons within the jurisdiction of this state have

9 the right to be free from any violence, or intimidation by threat of violence, committed against their

10 persons or property because of political affiliation. . ." Plaintiff asserts that Kranz has a history of

11 harassing animal-rights activists at the Cow Palace, Opp. Memo. at 36, yet she has proffered little

12 evidence as to the truth of this assertion.  On the contrary, plaintiff points to a statement by Kranz

13 which supports the notion that Kranz's enforcement of the barricade was not speech-based. Opp.

14 Memo. at 6. ("Thus, Officer Kranz admitted that the only factor he considered when determining

15 whether [Bolbol] was trespassing was where the Circus had put the barricades and whether the

16 general public was allowed past them.").  Plaintiff does reassert evidence that Kranz failed to

17 independently find probable cause as to the citizen's arrest prior to detaining and arresting Bolbol,

18 however the trier of fact could not reasonably determine from this evidence alone that animus

19 toward

20 Bolbol's political affiliation motivated the alleged unconstitutional behavior.  Accordingly, the court

21 grants summary judgment in favor of defendants as to this claim.

22                    4.          California Civil Code Section 52.1

23    Plaintiff claims that defendants have violated Cal. Civ. Code § 52.1, which provides for

24 damages if a person "interferes by threats, intimidation, or coercion, or attempts to interfere by

25 threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of

26 rights secured by the Constitution or laws of the United States, or of the rights secured by the

27 Constitution or laws of this state, the Attorney General, or any district attorney or city attorney . . ."

28

United States District Court

For the Northern District of California

Cal. Civ.Code § 52.1(a). As previously discussed, plaintiff's evidence supports a finding that Kranz violated plaintiff's federal First Amendment and state Liberty of Speech rights and presents an issue of material fact whether he violated her civil rights pursuant to the Fourth Amendment, state unlawful seizure law and Cal. Pen. Code § 236. Because a violation of each of these rights supports a violation of section 52.1, summary judgment as to plaintiff's section 52.1 claim is denied.

Additionally, as to the question of damages available under section 52.1, this court has recently held that "[s]ection 52 damages include actual damages, treble damages and exemplary damages. Moreover, actual damages include both special damages and general damages. Cal. Civ.Code § 52(h) . . . [however] section 52(b)(2) civil penalties are not available under section 52 .1(b)." *See Cuviello v. City of Oakland*, 2010 WL 3063199 (N.D.Cal., 2010).

### 5.   Immunity Under California Law

Defendants cite various state provisions that purportedly entitle the defendants to immunity from prosecution. The court first considers whether Kranz is immunized from prosecution per Cal. Gov. Code § 820.2 which states: "Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused." The California Supreme Court explained that "there is no basis for immunizing lower-level, or 'ministerial,' decisions . . . [and] immunity applies only to deliberate and considered policy decisions, in which a '[conscious] balancing [of] risks and advantages . . . took place. The fact that an employee normally engages in discretionary activity is irrelevant if, in a given case, the employee did not render a considered decision." *Caldwell v. Montoya*, 10 Cal.4th 972, 981 (1995) (internal quotations omitted) (quoting *Johnson v. State of California*, 69 Cal.2d 782 (1968); *see also Gillan v. City of Marino*, 147 Cal.App.4th 1033, 1051 (2007)) (finding that an officer's decision to arrest a plaintiff was "operational" and not subject to immunity under section 820.2.) Thus, section 820.2 does not immunize Officer Kranz here.

Neither does Cal. Gov. Code § 820.4 nor Cal. Gov. Code § 821.6 immunize Kranz. Section 820.4 provides: "A public employee is not liable for his act or omission, exercising due care, in the

United States District Court

For the Northern District of California

1    execution or enforcement of any law.  Nothing in this section exonerates a public employee from

2    liability for false arrest or false imprisonment."  Because as discussed above, the court now declines

3    to make a determination of probable cause pending its further review of the disputed facts, Kranz

4    may not raise this defense.

5          Section 821.6 provides: "A public employee is not liable for injury caused by his instituting

6    or prosecuting any judicial or administrative proceeding within the scope of his employment, even if

7    he acts maliciously and without probable cause."  "Section 821.6, however, provides no immunity

8    from liability for false arrest or false imprisonment." *Gillan*, 147 Cal.App. 4th at 1048 (citing

9    *Sullivan v. County of Los Angeles* 12 Cal.3d 710, 719-722 (1974)).  "The California Supreme Court

10   has read [s]ections 820.4 and 821.6 together to shield officers from 'liability for ... a suspect's

11   incarceration after the institution of lawful process' but not 'when a police officer causes a suspect to

12   be confined unlawfully' or without process." *Drakeford v. County of Orange*, 213 Fed.Appx. 542,

13   546 (2006) (quoting *Asgari v. City of Los Angeles*, 15 Cal.4th 744, 758 (1997)).  The applicability of

14   section 821.6 then turns on whether Kranz's detention and arrest of Bolbol were lawful or

15   constituted false arrest.  Because the court declines to determine the issue of probable cause at this

16   time for reasons stated above, Kranz may not raise section 821.6 as a defense.  Moreover, defendants

17   concede that to the extent that Kranz is found liable for violations of Bolbol's state civil rights, Cal.

18   Govt. Code § 815.2(a) imposes respondeat superior liability on the City.  Consequently, the court

19   finds that the City may be liable for Kranz's violations under state law of plaintiff's civil rights, and

20   summary judgment as to the City's liability on plaintiff's state law-based claims is denied.

21          E.    Summary

22          Summary judgment as to plaintiff's first, sixth, seventh, eighth, and eleventh claims is

23   GRANTED in favor of defendants.  Summary judgment as to all claims against defendant McLane is

24   GRANTED in favor of defendants.  Summary judgment as to all federal claims against the City is

25   GRANTED in favor of defendants.  Summary judgment as to plaintiff's second, third, fourth, fifth,

26   ninth, tenth, and twelfth claims is DENIED.  Summary judgment as to plaintiff's remaining state law

27   claims against the City is DENIED.

28

II.     Consolidation

On November 9, 2009 Mark Ennis filed Case No: C 09-05318.  Plaintiff and Mark Ennis now move to consolidate their actions pursuant to Federal Rule of Civil Procedure 42(a). *See* Docket No. 59 (Plaintiff's Notice of Joinder).  Federal Rule of Civil Procedure 42(a) permits a trial court, at its discretion, to consolidate actions that involve "a common question of law or fact pending before the court." Fed .R.Civ. P. 42(a).  Here, each action asserts substantially the same claims against the same defendants and raises substantially the same questions of law and fact.  Thus, all of the prerequisites for consolidation under rule 42(a) are present, and the court orders that the two actions be consolidated.

III.    Leave to File First Amended Complaint

Plaintiff's complaint identifies as defendants, "Does 1 - 20," providing notice that she intended to amend her complaint upon discovery of the true names of the unknown defendants. Complaint ¶ 10.  Plaintiff now seeks leave to amend her complaint to add new defendants and refine her claims based on additional discovery.

A party may amend a pleading once as a matter of course and thereafter only by consent of the opposing party or by leave of the court. Fed.R.Civ.P. 15(a)(2).  Leave should be freely given when justice so requires. Fed.R.Civ.P. 15(a)(2).  In determining whether to grant leave to amend, the court considers five factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint. *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004).  Not all of the factors merit equal consideration; prejudice is the "touchstone of the inquiry under rule 15(a)" and "carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003); *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001).  The Ninth Circuit has construed Rule 15(a) broadly, requiring that leave to amend be granted with "extraordinary liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990); *Poling v. Morgan*, 829 F.2d 882, 886 (9th Cir. 1987).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

Defendants oppose plaintiff's motion to amend on the grounds that the addition of new defendants and new claims against existing defendants and proposed defendants would be unduly prejudicial at this stage of the action.[6]  Specifically as to Kranz, defendants assert concerns that subjecting Kranz to additional discovery and any new defense strategy that must arise in light of additional claims would be especially costly and prejudicial to his defense.  Plaintiff argues that delays in the discovery process prompted her delay in bringing this motion, and the interests of justice require that the court grant her permission to amend her complaint in light of recent revelations.

Balancing the interests here involved, the court finds that the addition of new names to the action would not be unduly prejudicial to the extant defendants.  The parties have already conducted significant discovery, including the deposition of Officer Kranz, and at hearing the parties agreed that the addition of new defendants will not require significant new discovery.  While some delay is certain to follow from the addition of new defendants, the court does not find this prospect of resulting prejudice sufficient to deny plaintiff's motion.  The court, however, declines to decide at this time whether plaintiff may amend her complaint to add additional claims.  Rather, the court orders the plaintiff to submit, within 20 days of this order, a Proposed First Amended Complaint consistent with the court's conclusions here and inclusive of all new claims that plaintiff hopes to bring.  At that time the court will make its determination as to whether plaintiff may proceed with additional claims against the defendants.

29

1

2 CONCLUSION

3       The court orders that defendants motion for summary judgment is GRANTED in part and

4 DENIED in part as set forth above.

5       The court orders the present action CONSOLIDATED with Ennis v. City of Daly City, et.

6 al., Case No. 09-5318.

7       The court orders that plaintiff's motion for leave to amend is GRANTED to permit the

8 addition of new defendants.  The court orders plaintiff to submit a Proposed First Amended

9 Complaint, consistent with the court's conclusions here, within 20 days of the date of this order.[7]

10 After review of plaintiff's Proposed First Amended Complaint, the court will rule as to plaintiff's

11 request for leave to amend the complaint in regard to the addition of new claims.

12 IT IS SO ORDERED.

13

14

15 Dated: November 16, 2010

16                                                    MARILYN HALL PATEL
                                                     United States District Court Judge
17                                                   Northern District of California

18

19

20

21

22

23

24

25

26

27

28

30

United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ENDNOTES**

1. The court takes time here to resolve defendants evidentiary objections. Docket No. 54. All but three Objections (Nos. 4, 5, and 6) are denied as moot because the court did not rely upon any of the objected-to evidence in reaching its decision. The remaining three objections refer to Docket No. 41 (Leigh Dec.), Exh. A (DVD Clips) 6-8. These are video clips taken by plaintiff on September 13, 2008. The defendants object to all three clips on the grounds that they lack foundation pursuant to Federal Rule of Evidence 602 and that they are hearsay pursuant to Federal Rule of Evidence 801(c). The court finds that the clips in question have been properly authenticated by the plaintiff's evidence. See Bolbol Dec.¶ 52 for authentication of clip 6; Ennis Dec. ¶ 21, for authentication of clip 7; and Cuviello Dec. ¶ 13, for authentication of clip 8. The court finds that the three clips are not hearsay because defendants have not proffered an argument as to why these clips should be treated as an assertion within the meaning of Fed. R. Evid. 801(c). As to clip 8, which depicts images of Bolbol and Kranz, the court finds that this evidence is relevant to the factual inquiry as to whether Kranz used excessive force. Accordingly, defendants Objections are OVERRULED.

2. At the outset, the court notes that the legal issues presented here are largely identical to those previously considered by the court in the motion for summary judgment in *Cuviello v. City of Oakland*, 2009 WL 3707014 (N.D.Cal. 2009). In *Cuviello*, the court adopted the "Report and Recommendations" prepared by Magistrate Judge Chen as to the parties' motions for summary judgment. *See* Docket No. 218 (Report and Recommendations). To the extent that the legal issues presented here are identical to the claims presented in *Cuviello*, the court applies the legal conclusions delineated in Magistrate Judge Chen's Report to the facts presented here.

3. The court notes that defendants have not proffered any evidence from the state fire marshal's office reflecting the fire marshal's alleged instruction as to the placement of the barricades on this occasion.

4. Examples of additional case law citations to *Arpin's* rule include *John v. City of El Monte*, 515 F.3d 936, 941 (9th Cir. 2008); *Peng v. Mei Chin Penghu*, 335 F.3d 978 (9th Cir. 2003); *Sin v. Crystal Park Hotel Casino*, 77 Fed.Appx. 433, 434 (9th Cir. 2003); *Salisbury v. Ward*, 2006 WL 3742226 at 4 (N.D. Cal., 2006) (Chesney, J.); *Durante v. City of Reno*, 2006 WL 240797 at *8 (D.Nev., 2006).

5. Cal. Pen. Code § 847(b) states:

> There shall be no civil liability on the part of, and no cause of action shall arise against, any peace officer or federal criminal investigator or law enforcement officer described in subdivision (a) or (d) of Section 830.8, acting within the scope of his or her authority, for false arrest or false imprisonment arising out of any arrest under any of the following circumstances:
> > (1) The arrest was lawful, or the peace officer, at the time of the arrest, had reasonable cause to believe the arrest was lawful.
> > (2) The arrest was made pursuant to a charge made, upon reasonable cause, of the commission of a felony by the person to be arrested.
> > (3) The arrest was made pursuant to the requirements of Section 142, 837, 838, or 839.

6. Defendants note that plaintiff filed her initial complaint over a year prior to the date of plaintiff's motion to amend, and suggest that at this stage of the litigation, her motion is proffered in bad faith and calculated to delay the proceeding.

7. At the hearing held on September 13, 2010, the court noted that plaintiff had failed to file a Proposed First Amended Complaint with her motion for leave to amend the Complaint. It light of this oversight, the court ordered plaintiff to file a Proposed First Amended Complaint no later than September 17, 2010. Plaintiff filed an First Amended Complaint on September 17, 2010 instead of a <u>Proposed</u> First

31

Amended Complaint, as ordered by the court.  Consequently, defendants filed an Answer on October 7, 2010.  The court now emphasizes that plaintiff should file a <u>Proposed</u> First Amended Complaint consistent with the court's conclusion in this order within 20 days of the date of this order.  The court orders defendants to file their answer within 20 days of the date that plaintiff files her Proposed First Amended Complaint.

**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28